SHEFFIELD et al. v. MITCHELL et al.

(Supreme Court, Appellate Division, First Department.  June 28, 1898.)

1. SALE—RESCISSION—FRAUDULENT REPRESENTATIONS.

A partner of a tea firm, in order to procure on credit teas required to fill a contract with the government, made specific representations to the broker employed by the firm that the other partner owned a prosperous grocery business, and was worth $40,000. The plaintiffs, relying upon these representations as repeated to them by the broker, sold certain teas to the firm on credit.  The representations were wholly false, the person in question in fact being insolvent.  *Held*, in an action to rescind the sale, that the representations were fraudulent, and entitled the plaintiffs to a rescission.

2. SAME—SALE BY FRAUDULENT VENDEE.

After the sale to the firm, the latter sold the teas to the government, and subsequently transferred their business, without consideration, to the defendant corporation, with intent to hinder, delay, and defraud creditors, and the corporation subsequently received from the government the price of the teas.  *Held*, that, these proceeds being directly traced to the corporation, the plaintiffs were entitled to a judgment against the latter for the amount thereof.

Appeal from special term, New York county.

Action by Archibald Sheffield and others against John T. Mitchell and others.  From a judgment for plaintiffs, defendants appeal.  Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTER=
SON, O'BRIEN, and INGRAHAM, JJ.

T. M. Tyng, for appellants.
Henry B. Twombly, for respondents.

INGRAHAM, J.   The action was to set aside a sale of certain teas
made to the defendants Mitchell & Cooper, and to follow the proceeds
of such teas in the hands of the government of the United States, or
in the hands of the defendant Mitchell & Cooper Company, to whom
Mitchell & Cooper had transferred this property.  The court below
found that the sale of the teas by the plaintiffs to the defendants
Mitchell & Cooper was made by the plaintiffs in reliance upon the
statement that the defendant Mitchell was worth $40,000, which state-
ment was false; that said false representations gave the plaintiffs a
right to rescind said sale, and that on or about the 12th day of March,
1897, they did rescind it, and demanded of the defendants the return
of the teas or the proceeds thereof from the sale to the United States
government, which demand was refused; that the proceeds of the sale
of the teas were collected from the United States government, aggre-
gating in amount $2,465.12, and were turned over to the corporation
of Mitchell & Cooper Company, to whom such teas, or the proceeds
thereof, had been assigned or transferred; that the transfer of the
said teas or the proceeds thereof by the defendants Mitchell & Cooper
to the defendant the Mitchell & Cooper Company was without con-
sideration, and was made with the intent to hinder, delay, and defraud
the creditors of said Mitchell & Cooper, including these plaintiffs.
Judgment was directed against the defendants for the money in their
hands, the proceeds of the teas, with interest and costs.

The action was thus brought to rescind a sale of personal property
induced by fraud, and the evidence was sufficient to sustain a finding
that such sale was fraudulent.   The plaintiffs, tea merchants in New
York, were asked by one Ernest A. Nathan, a tea broker in New York,
to sell certain teas to Mitchell & Cooper.   Nathan had acted as broker
for Mitchell & Cooper from some time in August, 1896.   In August
or September, 1896, Nathan inquired of Cooper, a member of the firm
of Mitchell & Cooper, in reference to the credit of the firm.   Nathan
had made purchases for Mitchell & Cooper on credit from the firm
of Osborn & Lindsley, and told Cooper that they (Osborn & Lindsley)
wished to know something about his financial condition, and that,
"inasmuch as Hamilton & Cholwell (the firm of tea brokers of which
Nathan was a member) were to act as his (Cooper's) brokers, it was
essential we should know something as to his finances, so as to be
enabled to purchase goods for him as he might desire them from time
to time.   This was customary."   Here was a direct statement from
the brokers that they were acting for Mitchell & Cooper as brokers;
and, in the transaction of their business for them, it was necessary
that they should have knowledge as to the financial condition of their
firm.   The object of this could only be to obtain information to com-
municate to parties having dealing with Mitchell & Cooper.   In reply
to this question for information for that purpose, Cooper told Nathan

that his partner, Mr. Mitchell, "was rated in the mercantile agency at $10,000, but was worth over $40,000, and was prepared to back him all he was worth. He told me his partner, Mr. Mitchell, was engaged in the grocery business, a very prosperous man, also the owner of real estate. * * * He told me he had met a partner just prior to that who had lots of money, and desired Hamilton & Cholwell to act as his brokers. * * * Mr. Cooper had made that statement to me from time to time. He had made that statement to me within five days of the making of this purchase, at least, repeatedly, that Mitchell was worth over $40,000. The last time that I saw Mr. Cooper, that Mr. Cooper spoke to me on this subject, was about four or five days before the sale in this suit was talked about." Nathan testified that this last statement made by Cooper to him was made after the government contract with Mitchell & Cooper had been made, and when the sale of the teas for the government was in contemplation; that Cooper told him "it might be possible he (Cooper) would require a little time in the purchase of these goods for the government contract; that he could get the' money from Mitchell, but he did not want to bother him"; that the firm had been doing very well indeed, and had made money for the year; that Mr. Mitchell was worth $10,000 in the agency, and was actually worth over $40,000. "These were the representations he made to me after I was informed that the government had purchased teas from Mitchell & Cooper, and Mitchell & Cooper were looking for teas to fill that contract."

There was thus direct evidence tending to show that Cooper made these representations to his broker whom he had employed to obtain the teas necessary to fill this contract with the government, at the time he employed Nathan to obtain such teas for him, and when he was requesting that such teas should be obtained upon credit, upon the ground that he would require some little time to get the money from the government, and did not wish to bother his partner to make the necessary advances, again repeating the statement as to the amount that his partner was worth. There could have been but one object in making these representations, and that was that such representations were to be communicated to the persons from whom the teas were to be purchased, to induce such persons to sell the teas upon credit. Nathan then applied to the plaintiffs to sell the teas to Mitchell & Cooper. Nathan told the plaintiffs that "our customers, Mitchell & Cooper, were in the market for a certain kind of tea to fill a government contract, and I thought perhaps they might be desirous of purchasing some of his tea. He said he thought it was too much of a bill to sell to Mitchell & Cooper, inasmuch as, prior to that, he had sold them very small bills." Nathan told the plaintiffs that Cooper had informed him that his partner was rated at $10,000, and was worth over $40,000; that his (Cooper's) partner was in the retail grocery business uptown, and was doing a very prosperous grocery business. Just prior to this conversation, Mr. Churchill, one of the plaintiffs, said, "I do not know about Mitchell & Cooper;" and, in answer to that, Nathan repeated the statement which had been made by Cooper to him; and thereupon Churchill told Cooper that he would give him 15 days to pay for the goods, but, if they required

30 days, he (Churchill) would require 30-day notes, to which Cooper replied that it was satisfactory. The sale was made, and the teas were delivered to Mitchell & Cooper, and the evidence is that that sale was made relying entirely upon the statement of Nathan as to Mitchell's responsibility. The evidence was uncontradicted that those representations were absolutely false. Mitchell swore that he was indebted to his wife for upward of $5,000; that, on the 1st day of September, all the property he had was his grocery business; that that business might possibly be worth about $5,000; and that he owed other sums of money; and, so far as appears, the firm of Mitchell & Cooper had no capital invested in their business. It appeared that on March 10th a judgment was entered against Mitchell for over $5,000, which was unpaid, and that other judgments were obtained against Mitchell and the firm of Mitchell & Cooper, which were also unpaid. Thus it was established that at the time these representations were made by Cooper to Nathan for the purpose of obtaining credit for the firm of Mitchell & Cooper, and which Nathan, acting as the broker of Mitchell & Cooper, repeated to the plaintiffs, upon which the defendants obtained these goods upon credit, they were absolutely false. Mitchell individually, instead of being worth ten or forty thousand dollars, was insolvent; and the court was justified in finding that these statements were made with intent to deceive and defraud the plaintiffs, and did actually deceive them, and induce them to make this sale on credit. The testimony was thus sufficient to sustain the allegations of the complaint that the sale was induced by fraud, and the plaintiffs were entitled to rescind the sale, and recover back the teas, and, in the event of the purchasers having parted with the possession of the teas to the government, the plaintiffs were entitled to follow the proceeds of the teas upon their being specifically identified as such. Refining Co. v. Fancher, 145 N. Y. 554, 40 N. E. 206.

After these teas had been sold to the government, the firm of Mitchell & Cooper transferred their business to the corporation, the Mitchell & Cooper Company. That transfer the court has found was without consideration, and was made to hinder, delay, and defraud the creditors and these plaintiffs; and that finding was amply sustained by the evidence. It was also proved that that corporation subsequently received from the government the price that the government paid for these teas; and thus the proceeds of the plaintiffs' property were directly traced to the defendant corporation, and the plaintiffs were clearly, upon this proof, entitled to judgment against the corporation for the amount which it had received as the proceeds of the plaintiffs' property. The fraud in this case was clearly proved. The defendants Mitchell & Cooper obtained these teas from the plaintiffs upon the false and fraudulent representation of a fact as to the property of Mitchell, one of the purchasers, made with the intent to obtain the goods upon credit. The proceeds of these teas were directly traced to the defendant corporation, to whom the teas had been assigned by the fraudulent purchasers, without consideration, and for the purpose of putting such proceeds where they could not be recovered by the plaintiffs; and the plaintiffs were entitled to a judg--

ment against the person who had received the proceeds of the teas without consideration; and, such a judgment to recover such proceeds having been entered by the court below, it should be affirmed.

Judgment affirmed, with costs.    All concur.